John B. McCusker, Esq. (JM1482)
McCUSKER, ANSELMI,
ROSEN & CARVELLI, P.C.
210 Park Ave., Suite 301
Florham Park, New Jersey 07932
(973) 635-6300
*Attorneys for Plaintiff*
*ExxonMobil Oil Corporation*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| EXXONMOBIL OIL CORPORATION,<br><br>Plaintiff,<br><br>vs.<br><br>PBF HOLDING COMPANY LLC and PAULSBORO TERMINALING COMPANY LLC,<br><br>Defendants. | Civil No. :<br><br><br>Civil Action<br><br>**COMPLAINT** |

Plaintiff ExxonMobil Oil Corporation ("Plaintiff") by and through its attorneys, McCusker, Anselmi, Rosen & Carvelli, P.C., files this Complaint against Defendants PBF Holding Company LLC ("PBF") and Paulsboro Terminaling Company LLC ("PTC") (collectively "Defendants"), alleging as follows:

**I.      NATURE OF THE ACTION**

1. As set forth in detail below, in this action Defendants have wrongfully refused to abide by the plain terms of the Parties' Agreement and have instead chosen to play the part of extortionist. Seizing upon market-driven circumstances, Defendants have unscrupulously demanded Plaintiff abandon its rightful claims under the Parties' Agreement and enter into various separate unrelated agreements before Defendants will perform what it is already obligated to do. At numerous times,

1

Defendants' actions have indicated it is engaging in these unfair practices because it has chosen to undercapitalize its terminaling facility as a result of recent declines in overall profitability.

2.	Plaintiff seeks entry of judgment in its favor on each and every cause of action, along with such other and further relief as this Court deems just. Plaintiff notes that the Complaint contains a formal prayer for relief at its end (see below).

## II.	JURISDICTION AND VENUE

3.	Plaintiff is a corporation organized and existing under the laws of the State of New York, with its principal place of business in Irving, Texas.

4.	Defendant PBF Holding Company LLC ("PBF") is a limited liability corporation organized and existing under the laws of the State of Delaware with its principal place of business in Parsippany, New Jersey.

5.	Defendant Paulsboro Terminaling Company LLC ("PTC") is a limited liability corporation organized and existing under the laws of the State of Delaware with its principal place of business in Parsippany, New Jersey.

6.	There is complete diversity of citizenship between all the Plaintiffs and all Defendants in this case. The amount in dispute in this action, exclusive of interest and costs, exceeds the sum of $75,000; therefore, this court has jurisdiction over this dispute under 28 U.S.C. § 1332.

7.	This Court has personal jurisdiction over Defendants pursuant to the Parties' Master Agreement, discussed below, which states the Parties "agree to submit to the exclusive jurisdiction of the courts of New York including...federal courts as appropriate." A copy of the Master Agreement is attached hereto as **Exhibit A** at Clause 10.3.

8.	Clause 10.1 of the Master Agreement further states that New York law shall govern this dispute.

### III.   FACTS

#### A.  Background and Summary of the Relationship Between the Parties

9. Defendant PBF is a petroleum refiner and supplier of transportation fuels, oils, and other petroleum products in the United States.

10. Defendant PTC is a subsidiary of Defendant PBF.

11. Defendant PBF identified Defendant PTC as an assignee under the Parties' Amendment to the Subagreement, discussed below. The Amendment to the Subagreement is attached hereto as **Exhibit C**. Pursuant to Clause 8.3 of the Master Agreement, Defendant PBF remains "jointly and severally liable with the assignee for the full performance of the assignor's obligations under this Agreement, unless the Parties otherwise agree in writing."

12. Plaintiff likewise is in the petroleum business and owns and operates a Lube Oil Blend Plant in Paulsboro, New Jersey.

13. On or about September 2010, Defendant PBF acquired a refinery in Paulsboro, New Jersey ("Paulsboro Refinery"), adjacent to Plaintiff's Lube Oil Blend Plant.

14. At its Paulsboro Refinery, Defendants predominantly produce and manufacture fuels and oils, in addition to providing terminaling services (*i.e.*, marine receipt, pipeline access and storage of oil-based products for Plaintiff).

#### B.  The Terminaling Agreement Between the Parties

##### a. *Defendants' Obligation to Provide Terminaling Services for Plaintiff's Lubricant Base Oils*

15. On or about July 1, 2016, Plaintiff and Defendant PBF entered into a Master Goods and Services Agreement No. A2521207 ("Master Agreement"). A copy of the Master Agreement is attached hereto as **Exhibit A**.

16. Simultaneously, Plaintiff and Defendant PBF entered into a Terminaling Subagreement No. A2534461 ("Subagreement"). A copy of the Terminaling Sub-Agreement is attached hereto as **Exhibit B**.

17. Pursuant to Paragraph 4 of the Subagreement, on September 9, 2020, Defendants provided notice of termination of the Subagreement, which shall now thus expire on September 9, 2027.

18. The purpose of the Agreement, as stated in Clause 1 of the Master Agreement, is "to define the terms and conditions for the provision of Goods and Services… generally described as Base Oil and Terminaling."

19. Specifically, "[Defendants] shall provide the facilities specified in Exhibit A" of the Subagreement, discussed below, and "shall use all tankage identified in Exhibit A of Subagreement [ ] exclusively for the storage of [Plaintiff's] Products…" See Exhibit B to the Master Agreement, Clause 31, "Facilities."

20. Under the Subagreement, "Products" is defined as "Lubricant Base Oils." See Exhibit A to the Subagreement, Paragraph 1.

21. "Base oils" are a mixture of one or more base stocks, which are the key building blocks of lubricants and greases in a finished lubricant. Base oil properties can vary depending on their API group. The API classification system categorizes base stocks into numbered groups: Groups I, II, III, IV and V.

22. Under the Subagreement, Defendants are also required to "render or cause to be rendered to [Plaintiff] the following services to the extent necessary to meet [Plaintiff's] base oil requirements:

    (i)    Capacity to receive Lubricant Base Oils ("Products") from marine vessels;
    (ii)   Capacity to deliver Products to the Lube Oil Blend Plant at Paulsboro New Jersey ("LOBP") through the dedicated base oil pipeline located at the Paulsboro refinery;
    (iii)  Exclusive segregated storage tanks as delineated in Table A-1 below; and

(iv) Monthly volume accounting/reporting in accordance with Section 2 of this Exhibit. See Exhibit A to the Subagreement Paragraph 1(a).

23. Defendants are further required to "make the refinery available twenty-four (24) hours per day, seven (7) days per week for the receipt and/or delivery of Inhauls as long as the 21 day notice period is met as defined in Exhibit B." Id. at ¶ 1(c).

24. Exhibit B to the Subagreement, Paragraph 1, requires Plaintiff to notify Defendants "of all marine deliveries, the product to be shall, and the shipped quantities at least 21 days prior the vessel's scheduled arrival." With each barge, Plaintiff is also required to provide a Certificate of Analysis documenting the quality of the Product as set forth in Exhibit D of the Subagreement.

25. In making the refinery available twenty-four (24) hours, seven (7) days per week, Defendants "shall provide suitable facilities, piping, pumps, motors and related facilities so that it will be possible to receive product by marine vessel and load them into the storage tanks listed above and to ship such Products by pipeline from such tank to [Plaintiff's adjacent Lube Base Plant]…." See Exhibit A, Paragraph 5 of the Subagreement attached hereto as Exhibit B.

26. "Means shall also be provided [by Defendants] to clean … product lines used for loading or shipment of Product." Id.

27. Table A-1 of the Subagreement, delineating the "[e]xclusive segregated storage tanks" Defendants are required to provide to Plaintiff is as follows:

| Tank # | Capacity (KB) | Current Product | Terminal Line |
|---|---|---|---|
| 1117 | 75 | EM Stock 7279 | TL3 |
| 594 | 50 | EM Stock 6802 | TL6 |
| 595 | 50 | EM Stock 6802 | TL6 |
| 2799 | 27 | EM Stock 6578 | TL3 |
| 2800 | 27 | EM Stock 6578 | TL3 |

See Exhibit A to the Subagreement, Paragraph 1(a), Table 1-A.

28. The Parties contemplated the need to make additional tanks available to Plaintiff and thus, the Subagreement further stated that the Parties would make best efforts to enter into an amendment to potentially expand the Agreement to include certain additional tanks, with the responsibility to bring those additional tanks into service on Plaintiff.  See Exhibit A, Paragraph 4 of the Subagreement attached hereto as Exhibit B.

29. On or about June 1, 2018, the Parties entered an Amendment to the Subagreement adding Tank No. S-52 to the list of "exclusive segregated storage tanks" required to be provided by Defendants, stating Defendants "shall provide the facilities specified below:"

| Tank No. | Product Type | Estimated Approximate Shell Capacity (Barrels) |
|---|---|---|
| S52 | Group III Base Oil | 80,000 |

A copy of the Terminaling Sub-Agreement is attached hereto as **Exhibit C**.

30. Nothing under the Master Agreement, Subagreement or Amended Subagreement limits the "Products" (defined simply as "Lubricant Base Oils") to the specified "current" Product listed in Table A-1 of the Subagreement.  This is not only the plain language of the Agreement, but underscored by, among other things: the Amendment to the Subagreement simply listing the Product as "Group III Base Oil"; the requirement of Plaintiff to notify Defendants of "the products to be discharged"; and the Parties' past practices.

31. Specifically, in accordance with and in furtherance of the Parties' Agreement, frequently Plaintiff would notify Defendants of an anticipated marine delivery of a new product/component, including the Product to be discharged and the specific terminaling logistics required for the Product.

32. Notice to terminaling service providers of a new product/component or change in tank service is fundamental to performance of the Agreement and customary in the industry.

33. In response to each prior instance of notice of a new product/component and as recently as May 2021, Defendants acknowledged receipt of such notices, confirmed operational readiness, and provided the terminaling services required by the Agreement for the Product.

34. In exchange for Defendants' terminaling services, as described above, Plaintiff pays a monthly fee of approximately $364,281.

### b. *Defendants' Obligation to Reimburse Plaintiff for Product Loss Due to Line Loss*

35. In conjunction with the above terminaling services, under Exhibit G of the Subagreement, Defendants are:

> responsible for all Product loss and damage due to evaporation, shrinkage, line loss, and clingage that exceeds 0.50% of the total volume handled (as calculated by the method defined in Exhibit H) when Products are in the custody of [Defendants]. ExxonMobil shall calculate the Product losses at the end of each calendar year…and the value shall be determined based on the demonstrated average value, by ExxonMobil, of the product during that calendar year. If Product losses exceed 0.50%, ExxonMobil may claim for the lost Products.

36. Defendants are "also responsible for all direct, indirect, or consequential damages resulting from Product losses caused by negligence, gross negligence, or willful misconduct by [Defendants'] employees or agents when such losses result from the movement or storage of Products in [Defendants'] custody." Id.

### B. Defendants' Wrongful Refusal to Reimburse Plaintiffs for a 2018 Oil Loss

37. At the end of 2018, pursuant to the Parties' Agreement, Plaintiff calculated the year-end Product lost, which confirmed losses above the 0.50% allowance ("2018 Oil Loss").

38. Following discussions, and with the goal of determining the cause of and responsibility for the 2018 Oil Loss, in or about February 2019, the Parties formed a joint committee consisting of approximately eleven individuals, four of which were employees of Defendants (the "Joint Investigation Committee").

39. The Joint Investigation Committee met numerous times and in October 2019, reported that "the likely and perhaps sole cause" of the 2018 Oil Loss was Defendants' pigging/line clear process.

40. "Pigging" is used in pipeline maintenance to both clean pipelines and check their condition.

41. The 2018 Oil Loss amounted equaled the sum of approximately 0.66% or approximately 99,026.29 gallons over the 0.50% allowance under the Parties' Agreement, which is valued at approximately $228,733.16.

42. Following the Joint Committee findings, Plaintiff made repeated attempts to work with Defendants to resolve Defendants' pigging/line clear process and recoup the value of excess loss Plaintiff is entitled to under the Agreement; nevertheless, Defendants have failed and refused to reimburse Plaintiff for the 2018 Oil Loss.

C. **Defendants' Wrongful Refusal to Provide Terminaling Services for Plaintiff's Lube Base Oil, *Altum 4***

43. On or about December 9, 2020, Plaintiff contacted Defendants to discuss logistics for the transfer of their Lube Base Oil Product, *Altum 4*. Plaintiff sought to transfer *Altum 4* to either Tank 2799 or Tank 2800, the other tank to remain in *Yubase 4+* service.

44. Since on or about November 3, 2017, Defendants have been providing terminaling services for *Yubase 4+* in Tanks 2799 and 2800.

45. During discussions concerning the logistics for the transfer of *Altum 4*, Plaintiff expressed the critical nature of *Altum 4* to its operations given the current-market-based oil shortages.

46. In response, Defendants refused to provide terminaling services for *Altum 4*, first claiming unsupported technical challenges to doing so and ultimately demanding acquiescence to terms wholly unrelated to the terminaling services Defendants are required to provide under the Parties' Agreement.

8

47. More specifically, Defendants initially claimed numerous logistical challenges to the receipt of *Altum 4*, including the need for them to upgrade a valve on a tank line to properly segregate the Product, despite its obligation to, among other things, to provide "[e]xclusive segregated storage tanks," the "[c]apacity to receive Lubricant Base Oils ("Products")" and "suitable facilities…so that it will be possible to receive product…," including clean product lines for loading or shipment of the Product.

48. Thereafter, in numerous documents, correspondence, and telephone calls, Defendants repeatedly acknowledged that the valve and other technical matters initially raised were not a concern and that they had the technical ability to provide terminaling services for Plaintiff's *Altum 4* as required by the Agreement.

49. Despite these numerous admissions, in response to attempts to confirm logistics for the impending shipment of *Altum 4*, Defendants repeatedly indicated "commercial" issues related to compliance with its contractual obligations.

50. On or about June 1, 2021, Plaintiff again met with Defendants and provided notice of its intent to transfer *Altum 4* on the next barge set for arrival on or about June 24th.

51. On June 11, 2021, the bad faith of Defendants was fully exposed when they indicated they would only provide terminaling services for Plaintiff's *Altum 4* if Plaintiff agreed to conditions wholly unrelated to its obligation to provide terminaling services. Specifically, Defendants refused to provide terminaling services for Plaintiff's *Altum 4* unless Plaintiff agreed to: (1) maintain certain sensors inside its facilities and share data with Defendants upon request; (2) extension of two separate access agreements; and (3) to end collection efforts related to the 2018 Oil Loss. None of these actions are required by the Parties' Agreement.

52. Despite Defendants' bad faith, Plaintiff continuously performed and attempted to resolve the dispute. In accordance with Paragraph 10.2 of the Master Agreement, Plaintiff proposed a meeting between the Parties with representatives authorized to negotiate.

53. On June 22, 2021, Plaintiff and Defendants met twice; however, Defendants continued to wrongfully refuse to accept Plaintiff's *Altum 4* unless Plaintiff agreed to acquiesce to Defendants' unrelated demands.

54. In the meantime, Defendants' representatives proceeded to include *Altum 4* in the upcoming off-load plan for the barge set to arrive on June 24th. In doing so, Defendants forwarded to its shipment and receipts team, which is responsible for offloading the Product, specifications for receipt of the Product, including the Certificate of Analysis for *Altum 4* that Plaintiff had previously provided as required by the Agreement.

55. Nevertheless, and despite Plaintiff's full compliance with the terms and conditions of the Parties' Agreement, on or about June 25, 2021, upon the barge's arrival at Defendants' Paulsboro Refinery, Defendants refused to offload and accept for terminaling services the *Altum 4*.

56. To meet its base oil requirements, on a monthly basis from here on forward, Plaintiff must continue to transfer *Altum 4* to New Jersey to ultimately be used at its Lube Base Oil Plant, adjacent to Defendants' Paulsboro Refinery; yet, Defendants have indicated that they will continue to wrongfully refuse the Product.

57. As a result of Defendants' wrongful conduct and continuing breach, Plaintiff has been, and will continue to be, forced to haul, offload and store the *Altum 4* at an alternate location where it will then need to rail the Product to its Lube Base Oil Plant, adjacent to Defendants' Paulsboro Refinery, resulting in damages of well over $300,000 each month.

## FIRST CLAIM FOR RELIEF
### Breach of Contract Against Defendants – Terminaling Services

58. Plaintiff realleges and incorporates by references its allegations in Paragraphs 1 through 57.

59. As set forth above, among other things, Defendants are contractually obligated to provide to Plaintiff the exclusive segregated use of those tanks delineated; the "[c]apability to receive Lube Base Oils ('Products')" and capacity to deliver the Products to Plaintiff's adjacent Lube Base Oil Plant; to "make the refinery available twenty-four (24) hours per day seven (7) days per week for the receipt and/or delivery of Inhauls"; and to maintain "suitable facilities…so that it will be possible to receive product…," including the means to provide clean product lines for loading or shipment of such Products.

60. Defendants have materially breached, and continue to materially breach, their obligations by refusing to accept Plaintiff's *Altum 4* Product for terminaling services and are liable to Plaintiff.

61. Plaintiff has duly performed all its obligations under the Agreement and has repeatedly demanded Defendants fulfill their obligations under the Agreement.

62. As a result of Defendants' breach, Plaintiff has been, and continues to be, damaged in an amount to be determined by this Court, but no less than $300,000 per month.

## SECOND CLAIM FOR RELIEF
### Breach of Contract Against Defendants – 2018 Loss

63. Plaintiff realleges and incorporates by references its allegations in Paragraphs 1 through 62.

64. As set forth above, Defendants are contractually obligated for all Product lost due to line loss that exceeds 0.50% of the total volume handled when Products are in its custody.

65. In 2018, Defendants lost 0.66% of the total volume handled because of line loss; specifically, Defendants' pigging/line clear process.

66. Plaintiff has duly performed all its obligations and duties under the Agreement.

67. Despite its contractual obligation, Defendants have failed and refused to reimburse Plaintiff for approximately 99,026.29 gallons of Product lost over the 0.50% allowance under the Parties' Agreement.

68. By failing to reimburse Plaintiff for the 2018 Oil Loss, and otherwise failing to properly maintain the facilities to prevent line loss, Defendants have materially breached their obligations and are liable to Plaintiff.

69. As a result of Defendants' breach of contract, Plaintiff has been damaged in an amount to be determined by the court, but no less than $228,733.16.

## THIRD CLAIM FOR RELIEF
### Breach of Good Faith and Fair Dealing

70. Plaintiff realleges and incorporates by references its allegations in Paragraphs 1 through 69.

71. The Parties' Agreement contained an implied-in-law covenant of good faith and fair dealing that neither party would do anything to injure the right of the other party to enjoy the benefits of the contract.

72. At set forth above, Defendants have not taken the steps reasonably necessary to have suitable facilities to prevent Product loss and have the capacity to receive, deliver, and store Product in the exclusive segregated storage tanks Plaintiff has contracted for.

73. Defendants have further wrongfully withheld performance of the Agreement and by means of extortion have attempted to use the current circumstances to seek modification of the existing Agreement and entry into unrelated agreements.

74. At all times relevant, Defendants knew Plaintiff needed terminaling services for *Altum 4* to address recent market-based oil shortages.

75. Defendants have violated its covenant of good faith and fair dealing.

76. Plaintiff has performed every covenant, promise and condition on its part.

77. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered damages, including but not limited to those costs and expenses related to the 2018 Oil Loss and monthly alternate terminaling of *Altum 4,* along with shipping and transportation costs.

## FOURTH CLAIM FOR RELIEF
### Negligence

78. Plaintiff realleges and incorporates by references its allegations in Paragraphs 1 through 77.

79. As set forth above, Defendants had a duty to provide suitable facilities with the capacity to receive and transfer Plaintiff's Product without negligent loss of Product or Product loss due to line loss in excess of 0.50% .

80. Defendants breached its duty by failing to ensure suitable facilities, including lines to prevent loss.

81. As a direct and proximate result of the negligence and carelessness of Defendants, Plaintiff suffered damages.


**WHEREFORE**, Plaintiff respectfully requests this Court enter judgment against Defendants, granting Plaintiff the following relief:

1. Entry of judgment in favor of Plaintiff on each and every cause of action;
2. Award of the requested damages in the amount to be determined  Plaintiff has been damaged in an amount to be determined by the court, but no less than $600,000;

3. Award of costs of suit and attorney's fees; and

4. Such other and further relief as this Court deems just and proper.

          McCUSKER, ANSELMI,
          ROSEN & CARVELLI, P.C.
          210 Park Ave., Suite 301
          Florham Park, New Jersey 07932
          *Attorneys for Plaintiff*
          *ExxonMobil Oil Corporation*

By:    s/John B. McCusker, Esq.
      John B. McCusker, Esq.

Dated: July 26, 2021