UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------x
EXXONMOBIL OIL CORPORATION,

               Plaintiff,

    -against-

PBF HOLDING COMPANY LLC and
PAULSBORO TERMINALING
COMPANY LLC,

               Defendants.
------------------------------------------------x

**MEMORANDUM AND ORDER**

Case No. 1:21-CV-04183 (FB) (LB)

*Appearances*:
*For the Plaintiff*:
ARJUN D. SHAH
PATRICE LETOURNEAU
JOHN B. MCCUSKER
Duane Morris LLP
One Riverfront Plaza
1037 Raymond Blvd.
Suite 1800
Newark, NJ 07102

*For the Defendants*:
BRIAN GRAFFEO
LAUREN E. KOMSA
Williams, Graffeo & Stern LLC
60 Washington St.
Suite 204
Morristown, NJ 07960

**BLOCK, Senior District Judge:**

    Asserting diversity jurisdiction, plaintiff ExxonMobil Oil Corporation ("Exxon") brings states causes of action for breach of contract, breach of good faith and fair dealing, and negligence against PBF Holding Company LLC ("PBF") and Paulsboro Terminaling Co. LLC ("PTC") (together, "Defendants"). Exxon and the Defendants were parties to a contract requiring Defendants to tender services related

1

to the storage of Exxon's oil-based products in Defendants' facilities. Now, the parties each move for summary judgment in part. For the reasons that follow, Defendants' motion is granted in part and denied in part and Plaintiff's motion is denied.

## I.   FACTS

The following facts are taken from the pleadings, the parties' Rule 56.1 statements, and supporting documentation. They are undisputed unless otherwise noted.

Exxon owns and operates a lube oil blend plant in Paulsboro, New Jersey. PBF is a petroleum refiner that owns a petroleum refinery adjacent to Exxon's plant, where it provides storage of oil-based products. This service is referred to in the oil industry as "terminaling." In July 2016, PBF entered into a master goods and services agreement (the "Master Agreement") with Exxon, which sets forth provisions to govern a series of sub-agreements. One of those sub-agreements is a terminaling sub-agreement (the "Terminaling Subagreement") entered into by the parties the same month.[1] Under the Terminaling Subagreement, PBF is to provide terminaling services to Exxon, and PTC is to provide logistics services to Exxon. Also in July 2016, the parties entered into a Supply Agreement under which PBF

---

[1] PBF assigned the Terminaling Subagreement to PTC, so they are referred to collectively throughout this memorandum and order unless otherwise noted.

2

agreed to supply Exxon with approved crude oils produced at PBF's refinery in

Paulsboro.

Regarding potential modification of PBF's facilities that Exxon may require

for future services, the Master Agreement provides:

> Company or Buyer [Exxon] may request Contractor [Defendants] to modify
> the facilities provided under this Agreement, a Subagreement, or Order.
> Contractor shall endeavor to provide such modifications. Subject to
> Contractor's written consent, which will not be unreasonably withheld,
> Buyer may choose to pay for the modifications either at cost to Contractor
> for materials, supervision, and handling, or by paying Contractor a monthly
> fee.

Pl.'s Mem. of Law in Support of Mot. for Partial Summ. J., Ex. A: Master

Agreement at 31.3.

Also relevant to the motions before the Court is the Terminaling

Subagreement's provision regarding loss calculations, which provides:

> Contractor [Defendants] [are] responsible for all Product loss and damage
> due to evaporation, shrinkage, line loss, and clingage that exceeds 0.50% of
> the total volume handled . . . when Products are in the custody of the
> Contractor. ExxonMobil shall calculate the Product losses at the end of each
> calendar year or termination of this Subagreement and the value shall be
> determined based on the demonstrated average value, by ExxonMobil, of the
> product during that calendar year. If Product losses exceed 0.50%,
> ExxonMobil may claim for the lost Products. Contractor is responsible for
> all Product loss and damage due to evaporation.

Pl.'s Mem. of Law in Support of Mot. for Partial Summ. J., Ex. B: Terminaling

Subagreement at Ex. G—Responsibility for Loss or Damage and Loss Calculation.

The business relationship between Exxon and Defendants began to sour when, in 2018, Exxon calculated the quantity of product lost at year's end (the "2018 Loss") to be greater than 0.50%. As a result, the parties formed a joint investigation committee to determine the cause since under the Terminaling Subagreement, this would determine which party was responsible for compensating that loss. In the course of the investigation, Defendants claim they learned of several apparent deficiencies with Exxon's ability to track and measure the transfer of oil products. They believed that they were not responsible for the losses; therefore, they need not compensate Exxon.

While this investigation was ongoing, Exxon sought to terminal a product called Altum 4 at PBF's Paulsboro facility. Defendants argue that this was a new product that previously had not been terminaled at the Paulsboro facility, though Exxon claims it is substantially similar to another product Defendants had been terminaling for Exxon since 2017 called Yubase 4+.

Defendants state that because this product was not provided for in the Terminaling Subagreement and they had not terminaled it previously, they conducted an analysis to determine if they could accommodate the product. They state that they ultimately determined that providing terminaling services for Altum 4 would result in an unacceptable level of loss because the existing infrastructure was not appropriate for the product. Defendants claim that they used

4

their best efforts to offer to build new facilities to meet Exxon's needs and made proposals to Exxon to this effect, but that Exxon rejected those proposals.

Exxon, on the other hand, claims that the Terminaling Subagreement required Defendants to provide terminaling services for Altum 4, since the contract states that Defendants must have the "[c]apability to receive Lubricant Base Oils ('Products') from marine vessels," and Altum 4 is one of those products. Pl.'s Mem. of Law in Support of Mot. for Partial Summ. J., Ex. B: Terminaling Subagreement at Ex. A—Terminaling Services, Facilities, Equipment & Rates. Instead, Exxon argues that Defendants breached their obligations under the Terminaling Subagreement by refusing to accept Altum 4 for terminaling. It believes that Defendants' true motivation for refusing Altum 4 was nefarious, and that they did so to gain leverage in their negotiations of other contracts with Exxon and in apportioning the 2018 Loss. Exxon argues that in doing so, Defendants breached their contract.

As a result of Defendants' purported breaches, Exxon claims it has been forced to incur high costs associated with delivering and terminaling Altum 4 elsewhere. It seeks to recoup those damages in this action.[2]

---

[2] The Court has diversity jurisdiction over the dispute under 28 U.S.C. § 1332. Plaintiff is a corporation organized under the laws of New York with its principal place of business in Texas, and PBF and PTC are limited liability corporations organized under the laws of Delaware with their principal places of business in New Jersey; the plaintiff is seeking damages greater than $75,000. The Master

## II.    SUMMARY JUDGMENT

Summary judgment is appropriate only if the pleadings, the discovery materials on file, and any affidavits show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On a motion for summary judgment, the court must "resolv[e] all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Sloley v. VanBramer*, 945 F.3d 30, 36 (2d Cir. 2019) (*citing Burg v. Gosselin*, 591 F.3d 95, 97 (2d Cir. 2010)). The same standards are applicable to cross-motions for summary judgment: "[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) (internal citation and quotation omitted).

## III.    ANALYSIS

Exxon and Defendants have both moved for summary judgment as to a subset of the four counts in the complaint. Exxon moves as to count one for breach of contract as to the terminaling services, and as to count three for breach of

---

Agreement provides that New York law shall govern any dispute arising from that contract.

obligation of good faith and fair dealing. Defendants cross-move for summary

judgment as to count three and as to count four for negligence.

### a. Count One—Breach of Contract as to the Terminaling Services

Exxon alleges two counts of breach of contract: one deriving from

Defendants' apparent refusal to provide terminaling services for Altum 4 and the

other focusing on the 2018 Loss. Exxon moves for summary judgment only as to

the former count.

To show breach of contract, Exxon must demonstrate that: (i) there was a

contract, (ii) it performed, (iii) Defendants did not perform, and (iv) there are

articulable damages attributed to the breach. *See First Inv'rs Corp. v. Liberty Mut.*

*Ins. Co.*, 152 F.3d 162 (2d Cir. 1998). The parties primarily disagree on whether

the Terminaling Subagreement required Defendants to provide Exxon terminaling

services for Altum 4, and if so, whether Defendants made the contractually

required efforts to attempt to accommodate Exxon's request to do so.

The Terminaling Subagreement's main operational provision states that

Defendants must provide to Exxon the "[c]apability to receive Lubricant Base Oils

('Products') from marine vessels" and "exclusive, segregated storage tanks as

delineated in Table A-1 below." Pl.'s Mem. of Law in Support of Mot. for Partial

Summ. J., Ex. B: Terminaling Subagreement at Ex. A—Terminaling Services,

Facilities, Equipment & Rates. The table referenced lists five tanks and each "Current Product" contained in each tank. *Id*.

The use of the word "Current" to refer to the products in each tank at the time that the contract was executed implies that the parties contemplated that those products may change. This implication was confirmed by testimony from Defendants' employee[3] who was in charge of administering the contract. *See* Pl.'s Mem. of Law in Support of Mot. for Partial Summ. J., Ex. 17 ("Terminaling needs of any client changes over time as formulation needs change…The table below [referring to Table A-1] only lists the products that were in the tank at the time the contract is written. Products may be moved around as needs/volumes change.") In fact, Exxon had changed the products it terminaled with Defendants numerous times over the course of the contract's life. *See* Pl.'s Mem. of Law in Support of Mot. for Partial Summ. J., Ex. 9: Dep. Yvonne Schappell. at 115:24-116:4 ("the tanks that were [in] the agreement under Table A1 obviously have changed over the years with the base oils that are in them."); Ex. 8: Dep. Maurizo Costante at 93:3-4 ("We have changed products in the past relative to the table.").

---

[3] There is dispute in the record as to whether this person, Yvonne Schappell, was a contractor or employee at the time she made these statements. She is referred to as an employee for the sake of simplicity, though the use of this terminology is not a legal conclusion.

Also, there is no genuine dispute that Altum 4 is a lubricant base oil falling under the plain language of the Terminaling Agreement. *See* Pl.'s Statement of Undisputed Facts ("SOF") at ¶ 22; Pl.'s Mem. of Law in Support of Mot. for Partial Summ. J., at Ex. 24 ("Altum 4 and Yubase 4 Plus, both are Group III base oils with very similar properties and characteristics."); Ex. 7: Dep. James Fedena at 87: 11-16 ("Q: What kind of product was Altum 4? A: I believe it was a lubricant, a group three lubricant. Q: And did ExxonMobil have other products there that were a group three lubricant base oil, as well? A: I believe so.").

Exxon also supports its motion with substantial evidence to suggest that Defendants potentially had ulterior motives for declining to terminal Altum 4. At the time, PBF was experiencing financial difficulties and had recently laid off nearly half of its operational employees. The issue of the 2018 Loss had not been resolved, and, in Defendants' June 11, 2021 proposal to accommodate Altum 4, one of the requests it made was for Exxon to end its collection efforts related to the 2018 Loss. All of this shows, according to Exxon, that Defendants were either using Exxon's need to terminal a new product as leverage to negotiate parallel issues with the company or to wiggle out of its obligations under the Terminaling Agreement.

Exxon's theories may very well pan out to be true. However, all of this does not defeat the fact that terminaling Altum 4 at the refinery may not have

9

legitimately required alterations to the facilities due to potential differences in its composition from other lubricant base oil products previously terminaled there, among other potential causes. The record reflects that terminaling Altum 4 *may* have required alterations to Defendants' facilities. *See, e.g.,* Defs.'s Resp to Pl.'s SOF at ¶ 39 (quoting an email from one of Defendants' employees describing alterations that would be required to the facilities to accommodate Altum 4). The parties stringently dispute this point, which is material to determining whether Defendants breached. Whether alterations were necessary would either bolster or weaken Exxon's motive theory and determine if Defendants satisfied their obligations under the Master Agreement's provision on facility alteration.

Whether Defendants made a legitimate good faith effort to propose alterations to their facilities to accommodate Altum 4, or if these proposals were merely veiled attempts legitimize a breach of contract, remains unclear. Because the summary judgment standard calls for inferences to be made in Defendants' favor, the Court cannot comfortably determine at this stage that there exists no genuine fact issue as to whether Defendants breached their obligation to provide Exxon with terminaling services pursuant to the Terminaling Subagreement. Therefore, Exxon's motion for summary judgment is denied on this point.

**b. Count Three—Breach of Good Faith and Fair Dealing**

Both parties move for summary judgment as to Exxon's claim for breach of the implied covenant of good faith and fair dealing. The Court grants the Defendants' motion and denies Exxon's.

In New York, the law is clear: there is no separate cause of action for breach of good faith and fair dealing when it is premised on the same facts as a breach of contract claim. *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002) ("New York law ... does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled."); *Fasalino Foods Co. v. Banca Nazionale del Lavoro*, 961 F.2d 1052, 1056 (2d Cir. 1992) ("Under New York law, parties to an express contract are bound by an implied duty of good faith, but breach of that duty is merely a breach of the underlying contract.") (internal quotation marks and citations omitted).

This is exactly the case presently before the Court. The facts that Exxon pleads to support its breach of good faith and fair dealing claim are the same as those pleaded for its two breach of contract claims. The only difference is that it includes the alleged motive of "extortion . . . to seek modification of the existing Agreement and entry into unrelated agreements." Compl. at ¶ 73. Simply including the alleged motive for the alleged breach of contract does not surpass this pleading

11

obstacle. Therefore, summary judgment for the Defendants on count three is appropriate.

### c. Count Four—Negligence

Defendants also move for summary judgment as to Exxon's negligence claim. This claim is also duplicative of its breach of contract claims.

In order to plead a claim of negligence, Exxon must show that Defendants owed them a legal duty. *See, e.g., Lenard v. Design Studio*, 889 F. Supp. 2d 518, 529 ("To state a negligence claim under New York law, a plaintiff must plead (1) a duty owed to the plaintiff by the defendant; (2) a breach of that duty; and (3) an injury substantially caused by that breach.") (internal citation and quotation omitted). However, that duty must be separate from the duty to perform a contract: "[a] simple breach of contract is not to be considered a tort unless a duty independent of the contract itself has been violated." *MacMillan, Inc. v. Federal Ins. Co.*, 764 F. Supp 38, 41 (S.D.N.Y. 1991); *see also Chase Manhattan Bank, N.A. v. Remington Prods., Inc.*, 865 F. Supp. 194, 200 (S.D.N.Y.1994) ("New York does not recognize a cause of action for negligent performance of a contract.") (citing *Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 70 N.Y.2d 382, 389, 521 N.Y.S.2d 653, 516 N.E.2d 190 (N.Y. 1987)).

The duty that Exxon alleges forms the basis of its negligence claim is Defendants' "duty to provide suitable facilities with the capacity to receive and

transfer Plaintiff's Product without negligent loss of Product." Compl. at ¶ 79. This duty arises from the Terminaling Agreement and is the same duty for which Exxon seeks recovery with its breach of contract claim. The same duty cannot underpin both claims. Accordingly, summary judgment is granted for Defendants as to count four.[4]

---

[4] Defendants also ask the Court to find that Exxon should not be entitled to consequential damages. They argue that the Terminaling Subagreement only contemplates such damages for "negligence, gross negligence, or willful misconduct" on the part of Defendants. Pl.'s Mem. of Law in Support of Mot. for Partial Summ. J., Ex. B: Terminaling Subagreement, Ex. G—Responsibility for Loss or Damage and Loss Calculation. Exxon has not made a specific claim for such damages, though as explained, its negligence claim is foreclosed as a matter of law. Still, the Court reserves judgment on the issue of damages, which is subject to the findings of a jury and the parties' damage theories presented at trial. To the extend that Defendants' motion asks for such relief, their motion is denied.

## CONCLUSION

For the foregoing reasons, Defendant's motion for partial summary

judgment is **GRANTED in part and DENIED in part** and Plaintiff's motion for

partial summary judgment is **DENIED**. Therefore, counts three and four are

dismissed and counts one and two for breach of contract remain to be determined

at trial.

**SO ORDERED.**

_/S/ Frederic Block_____
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
June 26, 2023